A06A0731. IN RE TIDWELL et al.
A06A0732. IN RE FRENCH et al.
(632 SE2d 690)

ANDREWS, Presiding Judge.

In these two cases, the Newton County Department of Family and Children Services (DFCS); its director, Janice Tidwell; its services administrator, Rachel Taylor; its placement supervisor, Margarita Shaw; and caseworker, Kristine French, appeal from two orders of the Newton County Juvenile Court holding all of them in civil and criminal contempt for alleged failure to comply with an order of that court regarding placement of a deprived child, E. S. The two cases are consolidated for purposes of appeal.[1]

On August 8, 2005, DFCS filed deprivation complaints on behalf of F. N., E. S., and A. M., all children born of the same mother, Cindella Moore, but fathered by different men. Allen Scott was the father of E. S., a female who was 11 years old in 2005. Following Cindella Moore's testing positive for drug use in relation to the custody of F. N., the juvenile court entered a shelter care order on behalf of all three children. That order stated that "[i]t is therefore ordered that said child(ren) be placed in the custody of **the Newton County Department of Family & Children Services** until further order of the Court. . . ."

On August 11, 2005, DFCS filed a deprivation petition regarding these children and Allen Scott, who had remarried, was listed as E. S.'s putative father. On August 15, 2005, following the informal

---

[10] See *A. H. P.*, supra.

[1] No brief has been filed on behalf of the District Attorney's Office, which initially prosecuted these contempt matters.

detention hearing required by OCGA § 15-11-49 (c) (3), the juvenile court entered its order finding probable cause to believe that the children were deprived. Although Cindella Moore stipulated that the children were deprived as to her because of her substance abuse and Mark Anthony Moore, father of A. M., stipulated that he could not provide for the needs of his son, A. M., by himself, Allen Scott did not stipulate to any causes of deprivation of E. S. as to him. The identity and whereabouts of the father of F. N. were unknown. Temporary custody of the three children, according to this order, was to remain in DFCS pending an adjudicatory hearing on the deprivation petition.

Allen Scott filed a complaint/petition to legitimate E. S. in the juvenile court on September 8, 2005, stating that he was named as the father on her birth certificate in New Jersey and that genetic testing done there showed he was her biological father. Scott also filed with the petition Cindella Moore's consent to his legitimation of E. S. The results of a drug test conducted on Allen Scott in September were negative.

Contained in the record, although not marked "filed," is an Order of Adjudication Withholding Disposition, signed by the juvenile court judge and dated October 3, 2005, *nunc pro tunc* to September 8, 2005." Therein, the juvenile court found that the children were deprived as to their mother and the father of A. M. The order, however, withheld adjudication and disposition as to Allen Scott regarding E. S., including the issue of legitimation. Although no transcript of the September 8 hearing is contained in the record here, the order reflects that DFCS submitted into evidence a home evaluation conducted by Oasis of the home of Allen Scott and his wife. The report found the home to be an appropriate placement resource for E. S. The order continued temporary custody and control of the children in DFCS pending receipt of the relative search report from DFCS and the next scheduled hearing on November 10, 2005.

On October 7, 2005, DFCS filed a motion for review of the conditions of visitation with regard to the mother, Cindella Moore, only, requesting that her visitation with E. S. be supervised by DFCS because of her mental and emotional abuse of the children and based on the recommendation of E. S.'s therapist.

A hearing was held on this motion on October 13, 2005. At the beginning of the hearing, counsel for DFCS and Cindella Moore and the guardian ad litem appointed for the children by the juvenile court proposed that E. S. remain with Allen Scott for a period no longer than two years and agreed that E. S. was not deprived as to him. Again, at the conclusion of this hearing, counsel for Cindella Moore stated that there were family issues with E. S. which were going to be dealt with through counseling and that "[w]e've stipulated that custody should

remain with the father for up to two years and then the counselor determine about visitation [with Cindella Moore]."

During this hearing, a counselor employed by Pathways Transition Program testified that she had been asked to speak with E. S. during the past week. The counseling center had just been retained at that time. She had visited with E. S. at her school to talk about fears E. S. had expressed about visiting her mother for the weekend visitation the coming weekend. According to the therapist, E. S. expressed fears about her mother yelling at her and said that her mother had beaten her the past year. Asked several times if there were any arrangement under which she would be comfortable meeting with her mother, E. S. finally stated "for the police to be there." The therapist testified that she had no concern with E. S. staying with Allen Scott, her biological father, and that E. S. expressed "she is very happy there."

At the conclusion of this hearing the juvenile court judge stated:

> I see a different picture than y'all see. I have a therapist come in here and she don't know. She don't know what the problem is. . . . *As far as [E. S.], I'm no longer approving Mr. Scott's home.* Y'all can put counseling in effect, put both of them involved. But I will not have somebody sitting here saying tell your child you don't want to see them.[2] That's not going to happen. Y'all got some kids here that's got problems. I will not allow that to happen. So I don't believe a lot of what they're saying. I don't know what's going on but it's — I'm not going to allow this child to be put through that kind of a situation. *So take that child out today.* I'll set the hearing for November 10th, like it was before. This case is over.

(Emphasis supplied.)

In an order signed and filed on October 18, 2005, "nunc pro tunc to October 13, 2005," the trial court stated that the home of Allen Scott was no longer a suitable placement for E. S. and ordered that DFCS "shall no longer utilize the home of the father, Allen Wilson Scott, as a placement for the minor child, [E. S.], and shall remove the child from the placement as of October 13, 2005." The clerk was directed to mail copies to counsel for DFCS and French and a handwritten notation on the order indicates the order was "faxed and inbox 10/18."

---

[2] During Cindella Moore's testimony, she had described an incident of contested visitation during which she said Allen Scott told her to tell E. S. she did not want to see her because the parents could not agree on a pickup time. Allen Scott denied this.

On October 24, 2005, Assistant District Attorney Vanessa Weber filed a complaint/motion for contempt which alleged that DFCS, Tidwell, Taylor, Shaw, and French were "ordered to remove the child [E. S.] from the placement as of October 13, 2005 by verbal order and by written order entered on October 18, 2005[,]" and that they had "individually and jointly, wilfully failed and refused to comply with the Court Order and have not removed the child from the home." As relief, the petitioner sought that they be held in wilful contempt, "be incarcerated in the Newton County Detention Center and fined no more than $1,000.00 for their contemptuous conduct until their compliance with the Court[']s Order."

A rule nisi issued on October 24 for a hearing on October 27 directing the respondents to show cause why they "should not be held in contempt for violating this Court's Orders dated October 13, 2005."

On October 26, 2005, Weber filed a substitution of counsel requesting that the juvenile court substitute private attorney John Howell as attorney of record for the contempt hearing. No reason was given for the withdrawal of the district attorney's office. That same day, the juvenile court entered an order substituting John Howell as counsel. There is also in the record, although containing no stamp indicating it was ever filed, an order dated November 3, 2005, nunc pro tunc to October 26, 2005, appointing John Howell as "Special Prosecutor to conduct all proceedings in relation to the Motion for Contempt. . . ." There is nothing in the record to suggest that any hearing was held on October 26 regarding the substitution of counsel.

On October 27, 2005, DFCS filed a motion for reconsideration of the order of October 18, 2005. The juvenile court continued the contempt hearing until November 4, 2005, and denied the motion for reconsideration by order of October 28.

Following a hearing on November 4, 2005, the written orders at issue here were filed. In the first order, the juvenile court found French in wilful contempt "by disrupting the court proceedings and by obstructing the administration of justice by failing to answer proper questions propounded to the witness that would not violate her rights." She was ordered to serve a minimum of four hours in the Newton County jail. This order is appealed in Case No. A06A0732.

The second order found all the named respondents "in wilful contempt of the Order of this Court entered on October 18, 2005[,] nunc pro tunc to October 13, 2005 by wilfully failing and refusing to abide by the order in finding another placement for the minor child, [E. S.], and not removing the child until October 31, 2005 from the home of Allen Wilson Scott." The individuals were each found in civil and criminal contempt and ordered to serve a minimum of 24 hours in the Newton County jail. This order is appealed in Case No. A06A0731.

*Case No. A06A0731*

1. As stated in appellants' fifth enumeration of error, the juvenile courts of Georgia are courts of limited jurisdiction and their contempt powers extend only to violations of those courts' legally authorized orders or contumacious conduct in the presence of the court.

Pursuant to OCGA § 15-11-5 (a),

[i]n addition to all other inherent powers of the court to enforce its *lawful orders*, the court may punish a person for contempt of court for willfully disobeying an order of the court or for obstructing or interfering with the proceedings of the court or the enforcement of its orders, subject to the law relating to the procedures therefor and the limitations thereon.

(Emphasis supplied.)

(a) " 'A juvenile court is a court of special and limited jurisdiction, and its *judgments must show on their face* such facts as are necessary to give it jurisdiction of the person and subject matter. [Cits.] If the order of a juvenile court fails to recite the jurisdictional facts, the judgment is void. [Cit.]' [Cit.]" (Emphasis in original.) *Lockhart v. Stancil*, 258 Ga. 634 (373 SE2d 355) (1988). See also *Lewis v. Winzenreid*, 263 Ga. 459, 460-461 (435 SE2d 602) (1993).

It is not disputed that the juvenile courts of this state have exclusive original jurisdiction with regard to any child "[w]ho is alleged to be deprived. . . ." OCGA § 15-11-28 (a) (1) (C). "Deprived child" means[, in relevant part,] a child who: [i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals. . . ." OCGA § 15-11-2 (8) (A).

Here, as set out above, all parties at the hearing before the juvenile court on October 13, 2005, stipulated that E. S. was *not deprived* with regard to her father, Allen Scott. Further, the motion before the juvenile court which precipitated this hearing sought *only* to have changed the circumstances of visitation by Cindella Moore with E. S., who had previously been found to be deprived as to her mother.

In addition to the fact that there was no petition alleging deprivation of E. S. as to Allen Scott pending before the juvenile court, there was no evidence of deprivation with regard to Allen Scott. In fact, the only evidence in the record, aside from the parties' stipulation, was to the contrary, i.e., that E. S. benefitted from contact with her father and was very happy with him.

Because the written order of the juvenile court filed October 18, 2005, contains nothing on its face to demonstrate that the deprivation

of E. S. with regard to Allen Scott had been placed in issue in the hearing, it is void to the extent that it reaches a conclusion regarding this issue. *Lockhart,* supra at 634.

(b) To the extent that the juvenile court's finding of contempt was based on its oral pronouncement of October 13, 2005, it is a nullity.

> Under the Civil Practice Act (CPA), "(e)xcept when otherwise specifically provided by statute, all judgments shall be signed by the judge and filed with the clerk." OCGA § 9-11-58 (a). This portion of the statute was adopted verbatim in Uniform Juvenile Court Rule 17.1. See *English v. Milby,* 233 Ga. 7, 9-10 (1) (209 SE2d 603) (1974) (sections of the CPA may be adopted for the juvenile courts). Very similar language is also found in the Appellate Practice Act (APA): "The filing with the clerk of a judgment, signed by the judge, constitutes the entry of a judgment within the meaning of" the APA. OCGA § 5-6-31. Under the case law, "(i)t is best to think of three requirements. The adjudication must be reduced to (1) writing, then (2) signed by the judge and finally, (3) filed with the clerk of the court." Gregory, Ga. Civil Practice § 7-4, p. 574 (2d ed. 1997). " ' "*What the judge orally declares is no judgment until it has been put in writing and entered as such.*" ' [Cit.]" *State v. Sullivan,* 237 Ga. App. 677, 678 (516 SE2d 539) (1999) (involving "(t)he oral declaration of (a) juvenile judge"). Furthermore, "(t)he filing with the clerk of a judgment, signed by the judge, constitutes the entry of the judgment, and, unless the court otherwise directs, no judgment shall be effective for any purpose until the entry of the same. . . ." OCGA § 9-11-58 (b). See also Uniform Juvenile Court Rule 17.1. " ' "(U)ntil an order is signed by the judge (and is filed) it is ineffective for any purpose." (Cit.)' [Cit.]" *State v. Sullivan,* supra at 678.

(Emphases supplied.) *Titelman v. Stedman,* 277 Ga. 460-461 (591 SE2d 774) (2003). See also, e.g., *In the Interest of S. S.,* 276 Ga. App. 666, 667 (624 SE2d 251) (2005); *In the Interest of W. P. B.,* 269 Ga. App. 101, 102 (2) (603 SE2d 454) (2004).

2. In their first enumeration of error, appellants contend that the juvenile court was without authority to order specific placement of E. S. while she was in the temporary custody of DFCS and, therefore, appellants could not be found in contempt of an illegal order which attempted to do so. We agree.

OCGA § 49-5-1 et seq. and OCGA § 15-11-1 et seq. are to be considered in pari materia. *In the Interest of R. D.,* 141 Ga. App. 843 (234 SE2d 680) (1977).

Pursuant to OCGA § 49-5-3 (12),

"Legal custody" means a legal status created by court order embodying the following rights and responsibilities:

(A) The right to have the physical possession of the child or youth;

(B) The right and the duty to protect, train, and discipline him;

(C) The responsibility to provide him with food, clothing, shelter, education, and ordinary medical care; and

(D) *The right to determine where and with whom he shall live. . . .*

(Emphasis supplied.)

Once temporary legal custody of E. S. was placed in DFCS under the shelter care order in August 2005, the sole right to determine where and with whom she would live vested with DFCS. OCGA § 49-3-6; *In the Interest of C. A. C.*, 239 Ga. App. 725, 727 (2) (522 SE2d 236) (1999); *In the Interest of J. N. T.*, 212 Ga. App. 498, 499 (441 SE2d 918) (1994); *In the Interest of A. S.*, 185 Ga. App. 11, 12 (2) (363 SE2d 325) (1987); see *In the Interest of A. V. B.*, 267 Ga. 728, 729 (2) (482 SE2d 275) (1997); see also *In the Interest of A. L. L.*, 211 Ga. App. 767 (440 SE2d 517) (1994).

Any effort of the court to direct this decision is "merely exhortatory, and not binding. . . ." *In the Interest of R. D.*, supra at 844; *In re R. L. M.*, 171 Ga. App. 940, 942 (2) (321 SE2d 435) (1984).

Therefore, the direction of the juvenile court to remove E. S. from Allen Scott's home was not binding and there was no basis for a finding of contempt for failure to comply with it. See *Carden v. Carden*, 276 Ga. App. 43, 47 (1) (622 SE2d 389) (2005).

3. The third enumeration is that the juvenile court erred in appointing a private attorney to proceed with the contempt hearing after the district attorney's office had filed the petition for contempt.

Pursuant to OCGA § 15-11-41 (c),

[i]n any proceeding before the juvenile court, the judge, upon the court's own motion, may request the assistance of the district attorney or a member of the district attorney's staff to conduct the proceedings on behalf of the petitioner. If for any reason the district attorney is unable to assist, the judge may appoint legal counsel for such purpose.

While the juvenile court apparently correctly asked the district attorney to initiate the contempt proceedings, there is nothing in the record to explain the substitution of a private attorney for the district attorney.

The only mechanism for doing so is that contained in OCGA § 15-18-5 (a), which provides that when a district attorney is disqualified from interest or relationship from engaging in a prosecution, "the district attorney shall notify the Attorney General of the disqualification." The Attorney General is then authorized to request the services of and thereafter appoint a district attorney, solicitor-general, or retired prosecuting attorney; designate an attorney from the Department of Law; or appoint a competent attorney to act as district attorney pro tempore. OCGA § 15-18-5 (a) (1), (2), (3).

Therefore, on the record before us, it appears that the substitution of counsel was in error. See *In the Interest of K. R. C.*, 235 Ga. App. 354, 356 (2) (510 SE2d 547) (1998); *K. G. W. v. State of Ga.*, 144 Ga. App. 251, 252 (1) (240 SE2d 755) (1977).

4. In light of our rulings set out above, the remaining enumerations of error are rendered moot.

## Case No. A06A0732

In addition to the facts set out in Case No. A06A0731, the following facts are pertinent to this appeal of the contempt order issued regarding the testimony of French, the case manager, during the contempt hearing on November 4, 2005.

During French's testimony, the following exchange occurred:

MR. HOWELL: . . . Did you hear the Judge's pronouncement at the conclusion of that hearing as to what his Order would be?
THE WITNESS: I'm asserting my Fifth Amendment Right.
THE COURT: Answer the question, Ms. French.
THE WITNESS: I'm asserting my Fifth Amendment Right.
THE COURT: Mr. Campbell [DFCS's and individuals' attorney], do you want to talk to her? All he asked her was did you hear what the announcement was in the Court? . . .
MR. HOWELL: Did you specifically here [sic] the Court Order that the Newton County [DFCS] shall no longer utilize the home of the father, Allen Wilson Scott, as a placement of the minor child, [E. S.], and shall remove the child from placement as of October 13th, 2005?
THE WITNESS: I am asserting my Fifth Amendment Right.
THE COURT: Mr. Campbell, you want to talk to your client?
MR. CAMPBELL: No, sir.

THE COURT: All right. Ms. French, I'm going to direct you to answer the question. . . . I'm explaining to you if you do not answer the question I'm going to hold you in contempt of court and incarcerate you in the Newton County jail.

THE WITNESS: I am asserting my Fifth Amendment Right.

THE COURT: Mr. Bailiff, take her into custody. You will be held at the Newton County jail until such time as you answer the question. You are now obstructing justice and you will be held there until you answer the question.

Following this exchange, Campbell spoke with French and she agreed to answer questions, subject to her objection that answering was in violation of her Fifth Amendment rights. She did acknowledge being in court and hearing the oral pronouncement. Asked if she subsequently received a copy of the written order, French again asserted her Fifth Amendment rights, whereupon the following occurred:

THE COURT: Mr. Campbell, are we going to have this going on all morning?

MR. CAMPBELL: I believe so.

THE COURT: All right. Then I'm going to do this. I'm going to reinstate my Order. You'll be incarcerated and held until you answer these questions. . . [.] *I find the fact as to whether you received a copy of the order or not is, in fact, germane to this issue. It does not violate your rights.* And I'm going to incarcerate you until you give me the answer and *I'm going to incarcerate you for a minimum of four hours now.*

(Emphases supplied.)

5. As we held in Case No. A06A0731, the order entered regarding removal of E. S. from the Scott home was not a valid order and any finding of civil or criminal contempt for failure to comply with it was a nullity.

Since, however, French did spend time incarcerated for her failure to answer the questions set out above, we address the issue of criminal contempt arising from French's assertion of her Fifth Amendment right.

On appeal from a conviction of criminal contempt, we review the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Barlow v. State*, 237 Ga. App. 152, 157 (3) (513 SE2d 273) (1999). "Criminal contempt is that which involves

some disrespectful or contumacious conduct toward the court. Contempt of court has been variously defined; in its broad sense it means disregard for or disobedience of the order or command of the court." (Citation and punctuation omitted.) Id. It is " 'a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both.' *Bloom v. Illinois*, 391 U. S. 194, 201 (88 SC 1477, 20 LE2d 522) (1968)." *Garland v. State*, 253 Ga. 789, 790 (1) (325 SE2d 131) (1985). Every court has the power "to preserve and enforce order in its immediate presence and, as near thereto as is necessary, to prevent interruption, disturbance, or hindrance to its proceedings." OCGA § 15-1-3 (1). "Disobedience to the lawful order of a court is an obstruction of justice, and for such a violation the court, in order to compel respect or compliance, may punish for contempt." *Griggers v. Bryant*, 239 Ga. 244, 246 (1) (236 SE2d 599) (1977).

*In re Long*, 276 Ga. App. 306, 309-310 (623 SE2d 181) (2005).

The Fifth Amendment of the United States Constitution provides that no person shall be compelled in any criminal case to be a witness against himself. U. S. Const., Amend. V. The Georgia Constitution also provides a similar privilege, providing that no person shall be compelled to give testimony tending in any manner to be self-incriminating. Ga. Const. of 1983, Art. I, Sec. I, Par. XVI. In addition, OCGA § 24-9-27 (a) states that: "No party or witness shall be required to testify as to any matter which may criminate or tend to criminate himself or which shall tend to bring infamy, disgrace, or public contempt upon himself or any member of his family."

This privilege against self-incrimination extends not only to those answers that would in themselves support a conviction, but also to answers creating a "real and appreciable" danger of establishing a link in the chain of evidence needed to prosecute. *Axson v. Nat. Surety Corp.*, 254 Ga. 248, 250 (327 SE2d 732) (1985); see also *Begner v. State Ethics Comm.*, 250 Ga. App. 327, 330 (1) (552 SE2d 431) (2001).

The appropriate course where, as here, a witness invokes his right to remain silent is as follows: First, the trial court must determine if the answers *could* incriminate the witness. If so, then the decision whether it *might* must be left to the [witness]. On the other hand, where the trial court determines that the answers *could not* incriminate the witness, he must testify (or be subject to the court's sanction). It is for the court to decide if the danger of incrimination is "real and appreciable."

(Citations omitted; emphases in original.) *Lawrence v. State*, 257 Ga. 423, 424, n. 3 (360 SE2d 716) (1987); *Spivey v. State*, 200 Ga. App. 284, 285 (407 SE2d 425) (1991) (physical precedent only).

Under the circumstances here, it is apparent that the trial court did not engage in the required analysis, but merely declared that answering the questions concerning knowledge of the court's order regarding Allen Scott's home would not incriminate French. At a minimum, such knowledge would establish a link in the chain of evidence needed to prove French was in contempt of that order. Compare *In re Victorine*, 230 Ga. App. 209, 211 (1) (495 SE2d 864) (1998).

*Judgment reversed in Case Nos. A06A0731 and A06A0732. Barnes and Bernes, JJ., concur.*

DECIDED JUNE 12, 2006.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, P. Brian Campbell, Charissa A. Ruel, Assistant Attorneys General, Daniel C. Thomas*, for appellants.

*John P. Howell*, for appellees.