706 S.E.2d 686 (2011)
In the Interest of R.C.H., a child.
In the Interest of R.E.H., a child.
Nos. A10A2215, A10A2216.
Court of Appeals of Georgia.
February 9, 2011.
*688 Jana L. Evans, Dallas, for appellant.
Samuel S. Olens, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Joseph T. Justice, for appellee.
DOYLE, Judge.
The father of eleven-year-old R.E.H., a girl, and nine-year-old R.C.H., a boy, appeals from a juvenile court order finding the children to be deprived, arguing that the finding of deprivation was contrary to the evidence and that the juvenile court erred by: admitting and considering certain photographs obtained during a search of the father's home; finding that the Department of Family and Children Services ("the Department") used reasonable efforts to avoid removal of the children; and refusing to allow the father's counsel to obtain a copy of the forensic interviews of the children.[1] We affirm, for reasons that follow.
On appeal from a determination that a child is deprived, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. In so doing, this Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the juvenile court's fact-finding and affirm unless the appellate standard is not met.[2]
In December 2009, the Department received a referral alleging that in approximately December 2008, the father locked R.C.H. in a closet for two to three days without food or water, and he forced R.E.H. to touch "his private area." When a Department investigator went to the father's house and told him about the allegations regarding R.C.H., the father immediately turned to the children and asked them, in the presence of the investigator, whether he ever denied them food or water or locked them in a closet, and the children responded, "No." After the investigator told the father that she usually spoke to children and parents separately, the father repeatedly asked her whether she had what she needed, and the investigator left.[3]
The investigator interviewed the children at their school in January 2010, at which time they denied that the father locked R.C.H. in the closet or deprived them of food or water. On February 1, 2010, the investigator, a Department case manager trainee, and a detective went to the father's home again, but before the investigator could finish her introductions, the father "handed [her] a [business card for his lawyer], . . . asked if [they] were done, and told [her] to get off his property." That same day, the juvenile court entered an order permitting the Department to take the children into custody and place them in foster care.
On February 4, 2010, the Department filed a deprivation petition alleging that R.E.H. and R.C.H. were deprived because (1) an allegation had been made that the father locked R.C.H. in a closet without food or water (which the children denied); (2) R.E.H. reported that the father sexually abused her; (3) both children made disclosures of physical abuse by the father; (4) the children were "extremely dirty and ill-groomed" when they were taken into custody *689 by the Department; (5) the father demonstrated an inability to provide for the children in a safe and stable manner; and (6) the children were without proper parental supervision as required by law.
On February 3, 2010, the children submitted to forensic interviews.[4] According to the interviewer, who testified at the disposition hearing, R.E.H. cried and was upset throughout the interview, while R.C.H. "was not really emotional. It was almost as if he really didn't have any feelings about anything either way." During her interview, R.E.H. reported that her father made her touch him, drawing near the penis on an anatomical drawing, but pointing to an area directly above that, which the interviewer referred to as "the base of the penis" on the drawing.
The children were also interviewed by a psychologist in February 2010, who testified that R.C.H. told her that his father "beats the crap out of me[,] . . . shoved me against the wall[,] and it put a hole in the wall, . . . [and] used his fist to hit me in the face[,] and it gave me a black eye and a bloody nose and a busted lip." R.C.H. also told the psychologist that the father locked him in a closet for "a couple of days," denying him access to the bathroom or food for the first day and instructing R.E.H. to tell the school that her brother was sick. R.C.H. also reported that the father forced him to stand in a corner and threw DVD boxes at him, and that the father repeatedly called him stupid and "beat the crap out of him every day." R.E.H. reported that her father "would spank her so hard that she screamed," leaving bruises on her. R.E.H. also indicated in writing to the psychologist that "[her father] sexual[l]y abused [her] several times. He did it in bed once and made [her] touch him on his private part." The psychologist testified that the children "are terrified of their father" and "fear further harm at his hands."
The children's initial foster mother testified that when the children first arrived at her home, they were "nasty [and] filthy." R.C.H.'s toenails "were so long they wrapped around[,] . . . and unbelievable gunk was . . . in them," and his ears contained crusty, "black gunk." R.E.H.'s hair was like "a little rat's nest" and "came out in clumps" when she brushed it. R.C.H.'s clothes had a foul odor and were too small, and his school planner contained mold. According to the foster mother, the children were in "the worst shape, cleanliness-wise," of any of the 78 to 80 foster children she had cared for.
R.E.H. testified at a hearing that she had touched her father's "pee-pee" and that her father hit R.C.H. in the head, which hit the wall in the bathroom and left a hole. The father also testified at the hearing, explaining that the children's mother left when R.E.H. was two years old, and she had not seen the children in several years. The children had lived with the father since birth, except for a year beginning in July 2003 when the father was incarcerated, during which time the children lived with his aunt and father. The father and the children moved to Georgia from Arizona in the summer of 2006. The children do not have a regular doctor, and the father did not know their teachers' names.[5] The father "absolutely" denied sexually abusing R.E.H., and he testified that R.C.H. made "lots of stories up."
On March 22, 2010, following the final hearing, the juvenile court entered an order finding that the children were deprived and without proper parental care and control, and that the causes of deprivation were as follows:
he has failed to maintain a clean home, has neglected the hygiene of the children, has abdicated [R.C.H.'s] educational needs to others, has abdicated the cooking and cleaning to [R.E.H.], has allowed or required [R.E.H.] to become "parentified" and thus she has become [R.C.H.'s] caretaker and housekeeper, has allowed or required [R.E.H.] to cook and maintain the wood stove, has been physically abusive of [R.C.H.] and has been sexually abusive with [R.E.H.].
The court ordered that the children be placed in the temporary custody of the Department *690 "pending timely receipt of the relative search report from the Department" and that the father complete a case plan for reunification.
1. The father argues that the juvenile court erred by finding that there was clear and convincing evidence that the children were deprived. We disagree.
OCGA § 15-11-2(8)(A) provides that a child is deprived if he or she is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." "That definition focuses upon the needs of the child regardless of parental fault. The deprivation petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue."[6]
Here, the evidence supports the juvenile court's finding that the children were deprived. "Even assuming certain findings of the juvenile court are not supported by the record, there remain many [authorized] findings that support the court's finding of deprivation."[7] Although there may have been testimony from witnesses stating that they never saw any problems with the children, "this Court neither weighs the evidence nor determines the credibility of witnesses. We instead defer to the [juvenile] court's factfinding and affirm unless the appellate standard is not met."[8] The evidence that the father physically abused R.C.H., sexually abused R.E.H., and neglected the children's hygiene was sufficient to meet this standard.[9]
We find no merit in the father's argument that because the alleged sexual abuse of R.E.H. took place a year before the referral to the Department, it was "an `isolated incident,' which standing alone, cannot formulate the basis for a finding of deprivation." Here, the sexual abuse allegation was not the sole basis for the finding of deprivation. Furthermore, a juvenile court is authorized to consider a parent's past conduct in determining the likelihood that such conduct would continue in the future.[10]
2. The father further argues that the trial court erred by admitting, over the father's objection, photographs of the father's home. The photographs were taken by Lynn Deaver, an investigator with the Paulding County Sheriff's Department, while executing a search warrant that authorized her to examine the home's interior walls to look for indentations consistent with the children's allegations that the father smashed R.C.H.'s head into a wall. While in the home, Deaver took photographs of various items, which she testified were "in plain view," including a wood stove with license plates attached to the front as a door; a box in the basement containing animal feces; a wall that appeared to have been patched at some point; and a table containing a small propane tank and aerosol cans located in the same room as the wood stove.
The father argues that the juvenile court erred by admitting and considering the photographs taken by Deaver because they "depicted information that was clearly outside the scope of that search warrant," and thus, the juvenile court's consideration of them violated the father's rights under the Fourth Amendment of the United States Constitution. This argument is without merit.
"The Fourth Amendment to the United States Constitution and Article I, Section I, Paragraph XIII of the Georgia Constitution guarantee the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."[11] Pretermitting whether a purported *691 Fourth Amendment violation would preclude the admission of photographs in a child deprivation action, police officers are authorized to take photographs of items observed in plain view, as long as the officer is in a place where she is entitled to be.[12] And, even assuming that the admission of the photographs was erroneous, the father has failed to show that he was harmed thereby in light of the remaining evidence supporting the juvenile court's determination that the children were deprived.[13] Thus, this enumeration presents no basis for reversal.
3. The father contends that the juvenile court erred by finding that the Department used reasonable efforts to avoid removal of the children from the father's home. OCGA § 15-11-58(a) requires the Department to make reasonable efforts to prevent or eliminate the need for removal of a child from his or her home. Nevertheless, the statute also specifically provides that such reasonable efforts are not required if the juvenile court has determined that the parent subjected the children to chronic abuse or sexual abuse or "[c]ommitted a felony assault that results in serious bodily injury to the child. . . ."[14] Given the trial court's conclusion that the father physically abused R.C.H. and sexually abused R.E.H., we discern no error.[15]
4. In his final enumeration, the father argues that the juvenile court erred by refusing to allow his lawyer to obtain a copy of the recorded forensic interviews of the children, "making it impossible for the [f]ather to adequately prepare to address said evidence at trial."
The juvenile court held initial hearings in this case on February 22, 2010, and February 23, 2010. On March 1, 2010, the father's counsel verbally requested that the juvenile court direct the Department to provide him with a copy of the recorded interviews of the children. In response, the Department argued that even though the father had not engaged in the discovery process, it would permit the father's counsel to view the taped interviews, but declined to give him a copy of the tapes, citing privacy concerns for the children.[16] In a subsequent order, the juvenile court denied the father's request for copies of the tapes, finding, inter alia, that he had waived his right thereto pursuant to Uniform Juvenile Court Rules 7.1 and 7.3. The juvenile court noted, however, that the father "has seen the video several times" and ordered that notwithstanding counsel's failure to make such a request, the tapes "shall be made available for showing to the Respondent/Father at any time the court is open."
Pretermitting whether the father has a right to a copy of the videotapes and whether he waived any such right, the father has failed to show any harm resulting from the denial of his request for copies, given the evidence that he had viewed them multiple times and had unfettered access to view the tapes at any time the court was open. "Without harm, an alleged error presents no basis for reversal."[17]
Judgments affirmed.
ELLINGTON, C.J., and ANDREWS, J., concur.
NOTES
[1] The father appeals the deprivation order as to R.C.H. in Case No. A10A2215 and the order as to R.E.H. in Case No. A10A2216. We consolidate the appeals for purposes of this opinion. The children's mother, who left the family when R.C.H. and R.E.H. were six months old and two years old, respectively, is not a party to these appeals.
[2] (Citation and punctuation omitted.) In the Interest of T.V., 302 Ga.App. 124, 690 S.E.2d 457 (2010).
[3] According to the investigator, the father "was walking away from me backwards. He was telling the kids to get back in the shed. He wasn't being very open or forthcoming. . . . [H]e didn't have a very nice demeanor about him. So I was getting frustrated[,] and I said, `[Y]es, I'm done for now.'"
[4] Recordings of the forensic interviews were played for the juvenile court.
[5] The children received vaccinations at a health clinic.
[6] (Punctuation omitted.) In the Interest of V.A.D., 305 Ga.App. 23, 26, 699 S.E.2d 346 (2010).
[7] In the Interest of M.K., 288 Ga.App. 71, 73(1), 653 S.E.2d 354 (2007).
[8] (Punctuation omitted.) Id.
[9] See id.; In the Interest of T.R., 284 Ga.App. 742, 743-744, 644 S.E.2d 880 (2007); In the Interest of C.N., 231 Ga.App. 639, 640(1), 500 S.E.2d 400 (1998).
[10] See T.V., 302 Ga.App. at 127(1), 690 S.E.2d 457.
[11] (Punctuation omitted.) State v. Delvechio, 301 Ga.App. 560, 562, 687 S.E.2d 845 (2009).
[12] See Lord v. State, 297 Ga.App. 88, 92(1)(a), 676 S.E.2d 404 (2009).
[13] See In the Interest of T.J., 281 Ga.App. 673, 676(2), 637 S.E.2d 75 (2006).
[14] OCGA § 15-11-58(a)(4)(A), (B)(v).
[15] See In the Interest of A.B., 289 Ga.App. 655, 657(2), 658 S.E.2d 205 (2008).
[16] The Department also noted that the father had criminal charges pending against him and could presumably obtain a copy of the tapes from the State during the discovery process.
[17] (Punctuation omitted.) In the Interest of J.H., 273 Ga.App. 424, 427, 615 S.E.2d 231 (2005).