A11A1556. In the Interest of A. R. et al., children.
(726 SE2d 800)

Phipps, Presiding Judge.

We granted an application for discretionary appeal to review a juvenile court order terminating the parental rights of a biological mother to her children, A. R. and J. R. The mother contends that the evidence was insufficient to support many of the juvenile court's factual findings. Because we find no reversible error, we affirm.

> In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated. In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.[1]

Viewed in the light most favorable to the juvenile court's findings,[2] the record shows that on November 3, 2008, the mother of two-year-old A. R. and one-year-old J. R. told her roommates that she was going to kill herself and locked herself in a bathroom with a knife. The roommates called the police, and the mother was taken to an emergency room. At the hospital, a case manager with the Georgia Department of Human Resources, Division of Family and Children Services (DFCS) interviewed the mother, who stated that she was suicidal because neither she nor her children had eaten in 24 hours; she had no family, no money, no food, and no other resources; and she was about to be evicted from her residence. When asked about the children's whereabouts, the mother gave several different answers. Finally, she stated that the children were at home but she was not sure who was supervising them.

The case manager arrived at the home late that night and both children were awake, but were not clean and appeared to be wearing soiled diapers. There were several adults in the home, but it was not clear who was supervising the children. J. R. was in a room alone, lying on a mattress. One child had bruises on the buttocks and marks on the legs. The case manager took the children into emergency custody.

---

[1] *In the Interest of A. R.*, 302 Ga. App. 702 (691 SE2d 402) (2010) (citation and footnote omitted).

[2] *In the Interest of R. S.*, 287 Ga. App. 228 (651 SE2d 156) (2007).

On November 10, 2008, DFCS filed a deprivation petition. The children were still in DFCS's custody at the time. On November 19, 2008, with her attorney, the mother appeared before the court for a hearing[3] on the deprivation petition, and she consented to the entry of an order of adjudication and disposition finding her children to be deprived and placing temporary legal custody of the children with DFCS for one year. In December 2008, the court found that the children were deprived as defined in OCGA § 15-11-2 (8) (A), and found that the causes of deprivation were the mother's "neglect/lack of supervision; and the mother's financial inability to provide proper parental care, control and supervision for the children."

The court ordered DFCS to prepare a case plan for reunification. The court specifically ordered that the case plan be submitted to the court "to become the Court Ordered plan of care unless a party appeals the plan as provided by law. The mother . . . shall successfully complete the goals established in said plan before the children may be returned home." A case plan was developed for each child. The mother attended the case plan meeting and participated in the development of the case plans. She never requested a formal review of the case plans, which on January 9, 2009, were made an order of the court.

The case plans required the mother, for a minimum of six consecutive months, to obtain and maintain a source of income and to provide the DFCS case manager with monthly verification of income. The mother was also required, for a minimum of six consecutive months, to obtain and maintain stable, clean, and safe housing, and to provide her case manager with monthly verification that rent and utility payments were current. The mother was required to cooperate with a parent aide and follow the aide's recommendations. The mother was required to attend and successfully complete a psychological evaluation, including a parental fitness evaluation, and to follow all recommendations of a licensed treatment provider. The case plans also required that the mother attend all hearings, appointments with DFCS, case plan reviews, and scheduled visits with her children, and that she notify DFCS of all address changes within 48 hours.

On April 13, 2009, DFCS filed a motion for judicial review, alleging that the mother had failed to attend the last two periods of unsupervised visits with the children and that she had moved to Tennessee, without informing the case manager. After a hearing, the court suspended the mother's unsupervised visitations, but did allow

---

[3] No transcript of the November 19, 2008 hearing was included as part of the appellate record.

for supervised visitation, and ordered that the mother continue to address the other issues identified in her case plans until further review.

On October 26, 2009, DFCS filed another motion for judicial review, this time alleging that the mother had failed to attend the last two scheduled visits with the children and had moved to Michigan without informing the case manager. DFCS filed also a motion to extend for a year the temporary order of deprivation and custody, which was due to expire on November 2, 2009. After a hearing, the court found (among other things) that returning the children to the mother's home would be contrary to their welfare because the mother "was not sufficiently stable residentially or economically and she ha[d] not maintained a consistent bond with her children." The court further found that the children were deprived and extended temporary custody of the children to DFCS by order issued on May 26, 2010, "nunc pro tunc for December 2, 2009."

On November 30, 2009, DFCS filed a complaint and petition to terminate the mother's parental rights. At the termination hearing, the mother was present with an attorney. The parties stipulated to the admission of all previous court orders and to admission of a psychological evaluation report of the mother.

Recognizing that the mother had no family resources or support in Georgia, the DFCS case manager who had been assigned the case testified that she had placed a parent aide and a counselor in the home to work with the mother. These services were discontinued however, in March 2009 when the mother moved to Tennessee. The case manager testified that the mother called her within a week or two after she moved to Tennessee, but a period of six months had passed without the mother having any visitation with her children. On one occasion, the mother spoke with the children on the phone and on another occasion, she sent a letter with $140 enclosed for J. R.'s birthday.

The case manager testified that she could offer no services to the mother while she was in Tennessee until an evaluation through the Interstate Compact on the Placement of Children (ICPC)[4] was completed. The case manager requested through the ICPC a home evaluation in Tennessee, but the request was not fulfilled because by the time the home evaluation was scheduled to be conducted, the mother had reported to the case manager that she had temporarily moved to Michigan for employment. In September 2009, the mother told the case manager that she was moving back to Tennessee, to a

---

[4] See OCGA § 39-4-4, governing the placement of a Georgia child in another state.

different address. Because the mother had next mentioned moving to Florida, the case manager never initiated another home evaluation through the ICPC because she did not know where the mother would be residing. The case manager repeatedly asked the mother for documentation of income, but the mother never provided any verified proof of such.

The children's foster mother testified that before the mother moved to Tennessee, she (the mother) was exercising visitation three days a week. After moving to Tennessee, however, she visited the children only three times. Then, six months passed without visitation. Thereafter, she visited the children once in November 2009, twice in December 2009, and once in February 2010. The foster mother testified that the children called her "Mommy," and that she would be interested in adopting the children.

The coordinator of the supervised visitation center testified that from April 2009 to June 2009, the center had scheduled seven supervised visits for the mother, who attended only three of them. Before these visits, he had previously supervised visitation in November and December 2008; but his services were terminated after the mother was granted unsupervised visitation. The visitation center coordinator testified that during the visits in November and December 2008, the mother and children interacted in a positive manner. In contrast, during the April and May visits, he observed that the children no longer seemed to know their mother as well and were no longer relating well to her. During the last visit of February 1, 2010, just prior to the termination hearing, as the mother sat beside A. R., the coordinator asked A. R. to tell him who the person was sitting next to her, and the child "shrugged her shoulders, saying she didn't know." The coordinator testified that he felt the mother was "at a loss" as to what to do with the children during visitation.

A clinician who worked with the mother testified that for two months she counseled the mother for depression. The mother completed eight of twelve scheduled sessions. Of the four missed appointments, the mother gave no excuse for missing two; she explained that she missed one because she thought she had obtained a job, and she missed another one so she could visit her brother. The clinician testified that in many of the sessions, the discussion concerned getting a job and a place to live. The mother had been prescribed medication to treat her depression, but did not take it.

When the clinician counseled the mother, she (the mother) still had no job and no means to provide for her children, and she was being evicted from her home. The clinician testified that "the people who were supporting [the mother] had moved." The clinician testified that the mother had a low IQ, which, coupled with her depression and

failure to take her medication, would cause her to need a lot of support to care for herself and her children. The clinician testified that the mother lacked an understanding of how to obtain basic assistance for various services, and that the mother did not demonstrate that she could "follow up and do a lot of things," in caring for the children. The clinician did not believe that the mother was capable of providing and caring properly for her children.

A parent aide provided parent training services for the mother; she covered topics such as health, safety, discipline, and nutrition with the mother. The aide testified that the mother did not seem motivated, did not follow through with recommendations, and did not make any significant progress during the time that they worked together.

A speech pathologist testified that J. R. has a communication disorder and that, prior to the termination hearing, she had been working with J. R. on a weekly basis for the past seven months to improve his communication skills.

The mother's brother testified that the mother and her newborn child[5] lived with him, his wife, and another brother in a four-bedroom, two-bath apartment in Tennessee. Both brothers had jobs in the construction industry. The brother's wife, who worked in the daytime, cared for the baby while the mother worked in the evenings.

The juvenile court entered an order terminating the mother's parental rights to A. R. and J. R.

The mother challenges the juvenile court's findings that (1) A. R. and J. R. were deprived; (2) their deprivation was likely to continue; (3) the mother suffered from a medically verifiable deficiency; and (4) the mother without justifiable cause had failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights to: (a) develop and maintain a parental bond with the children in a meaningful, supportive manner, (b) provide for the care and support of the children as required by law or judicial decree, and (c) comply with a court-ordered case plan designed to reunite the children with the parent.

> To prove that parental rights ought to be terminated, [DFCS] first must prove "parental misconduct or inability" by clear and convincing evidence.[6] Such proof requires [DFCS] to establish that (1) the child is deprived; (2) the deprivation

---

[5] The mother gave birth to a third child approximately two weeks before the termination hearing. That child is not a subject of this proceeding.

[6] OCGA § 15-11-94 (a).

results from a lack of proper parental care or control; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[7] Where [DFCS] carries this burden, it then must prove that termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home.[8]

1. *Parental Misconduct or Inability.*

(a) *Finding of Deprivation.* The mother contends that in determining that A. R. and J. R. were deprived at the time of the termination hearing, the juvenile court erroneously relied on a temporary disposition order which had not been signed by the court or filed prior to the issuance of the termination order. Citing *In the Interest of Tidwell*,[9] the mother argues that because a juvenile court order is not effective for any purpose until it is signed and filed with the clerk, in finding that A. R. and J. R. were deprived, the juvenile court could properly place no reliance on the temporary disposition order from the December 2, 2009 hearing because it was not signed and filed until after the termination order was entered.

The mother is correct that generally, "until an order is signed by the judge (and is filed) it is ineffective for any purpose."[10] But an exception to this general rule "may be made when [as in this case] an order is entered nunc pro tunc to the date of the court's oral ruling."[11] "A nunc pro tunc entry is an entry made now of something actually previously done to have effect of former date; office being not to supply omitted action, but to supply omission in the record of action really had but omitted through inadvertence or mistake."[12]

Although a nunc pro tunc entry may not be used to supply an order not yet made by the court, [the mother] has failed to show that such order [issued May 26, 2010] was not initially made during the hearing before the trial court, which appears

---

[7] See OCGA § 15-11-94 (b) (4) (A) (i)-(iv).

[8] *In the Interest of M. S. S.*, 308 Ga. App. 614, 620 (2) (708 SE2d 570) (2011) (citations and punctuation omitted).

[9] 279 Ga. App. 734, 739 (1) (632 SE2d 690) (2006).

[10] *State v. Sullivan*, 237 Ga. App. 677, 678 (516 SE2d 539) (1999) (citation, punctuation and footnote omitted).

[11] Id. at n. 1; *Franklin v. State of Ga.*, 227 Ga. App. 30, 31, n. 1 (488 SE2d 109) (1997).

[12] *In the Interest of H. L. W.*, 244 Ga. App. 498, 498-499 (535 SE2d 834) (2000) (punctuation and footnote omitted).

to have taken place on December [2, 2009]. As the appellant, [the mother] had the burden to affirmatively show error by the record. This [s]he failed to do. Therefore, we must presume the trial court's judgment is correct.[13]

The mother further asserts that despite any reliance on prior findings of deprivation, the evidence failed to show that A. R. and J. R. were deprived at the time of the termination hearing. She argues that "it was undisputed that she was gainfully employed, had obtained stable housing, and [was] now surrounded by a great deal of familial support. Further, she was successfully caring for a new child without any government intervention."

OCGA § 15-11-2 (8) (A) provides that a child is deprived if he or she "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." "The juvenile court is not required to reunite the child with the parent in order to obtain current evidence of deprivation or neglect."[14] "The test in determining termination of parental rights . . . is whether the mother, *ultimately standing alone*, is capable of mastering and utilizing the necessary skills to meet her parenting obligations."[15]

The mother never appealed the issuance of the December 4, 2008 initial temporary order which included a finding of deprivation; indeed, she had consented to that finding. Nor did she appeal the juvenile court's December 2, 2009 extension of the temporary order, which also included a finding of deprivation.[16]

Where, as here, the children have been removed from parental custody, DFCS may prove current deprivation by showing that, if the children were returned to their mother at the time of the hearing, they would be deprived. This may be established by showing that the conditions upon which an

---

[13] *Sebby v. Costo*, 290 Ga. App. 61, 62 (658 SE2d 830) (2008) (citation and punctuation omitted).

[14] *In the Interest of R. B.*, 285 Ga. App. 556, 561 (3) (647 SE2d 300) (2007) (citation and punctuation omitted).

[15] *In the Interest of A. R.*, supra at 710 (1) (c) (citations, punctuation and footnotes omitted; emphasis in original).

[16] See *State v. Morrell*, 281 Ga. 152, 153 (2), (3) (635 SE2d 716) (2006) (an order is not appealable unless it is in writing; where trial court failed in its duty to put its oral order in writing, the party wishing to appeal the oral order may file a mandamus petition seeking to require the court to do so).

earlier finding of deprivation was based still exist at the time of the termination hearing.[17]

The mother's circumstances at the time of the termination hearing were not significantly different from the circumstances which caused A. R. and J. R. to be placed in the custody of DFCS. At the time DFCS opened a case on the family, the mother was living in an apartment with other adults upon whom she relied for support. The court based its earlier findings of deprivation on the mother's "neglect/lack of supervision; and the mother's financial inability to provide proper parental care, control and supervision for the children," the mother's insufficient compliance with the case plan, and the mother's failure to maintain "a consistent bond with her children." In its termination order, the court found that these circumstances had not changed. There was testimony that the mother depended on her brother for housing and on her sister-in-law for child care,[18] and that she had failed to comply with the case plan requirement of showing written proof of employment and stable housing.

The mother failed to complete counseling for her depression and parenting aide counseling, and she failed to take medication prescribed to treat her depression. After consenting to a court finding that her children were deprived and consenting to them being placed in the custody of DFCS, the mother moved to two different states within a period of six months and discussed moving to a third state, effectively hindering DFCS's ability to transfer agency services to her at any new place of residence. The mother failed to exercise scheduled visits with her children, and the older child no longer recognized her. "We find no merit in the mother's claim that the court impermissibly based its finding upon past rather than present deprivation; the order stated that the children *remained* deprived."[19] There was clear and convincing evidence to support the court's finding that the children were deprived.

(b) *Lack of Proper Parental Care or Control as the Cause of Deprivation.*

(i) *Finding that the mother suffered from a medically verifiable deficiency.* The mother contends that the juvenile court erred in finding that there was a lack of proper parental care or control due to

---

[17] *In the Interest of Z. H. T.*, 302 Ga. App. 424, 429 (1) (a) (691 SE2d 292) (2010) (footnotes omitted).

[18] See *In the Interest of A. R.*, supra at 709 (1) (c) (because the mother's income and housing were completely dependent upon her relationship with her boyfriend, they could not be considered stable).

[19] *In the Interest of Z. H. T.*, supra (emphasis in original).

a medically verifiable deficiency of her physical, mental or emotional health of such a duration or nature as to render her unable to provide adequately for the needs of her children.

In determining whether a lack of proper parental care or control as a cause of deprivation has been made,

> the court shall consider, without being limited to, the following: . . . A medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child. . . .[20]

"The court received evidence that the mother's psychological condition contributed to the reasons for which the court initially found the children to be deprived."[21] A psychological evaluation showed that the mother was diagnosed with depression. In addition to an evaluation of the mother's cognitive, emotional, and personality functioning, the mother was given a parent assessment.[22] The psychologist noted the mother's low level of education and low IQ. The psychologist recommended that before the mother regained custody of her children, she needed, among other things, to participate in ten to twelve individual counseling sessions to "work through emotional issues (treatment for depression, separation from her children, and guilt)." But the mother moved out of state and did not complete the case plan or recommended treatment for depression and emotional issues. At the time of the evaluation the psychologist noted that the mother was "willing to seek professional help to assist," and concluded that her symptoms of anxiety and depression could "most likely" be managed. The psychologist noted that all of these factors contributed to determining the mother's fitness for parenting.

The clinician who counseled the mother for depression testified that the mother's ability to function in society was compromised by her low IQ, her depression, and her failure to take her medication. The clinician testified that the mother did not have a good understanding of how to obtain basic assistance, and did not seem either to

---

[20] OCGA § 15-11-94 (b) (4) (B) (i), (v).

[21] *In the Interest of Z. H. T.*, supra at 430 (1) (b).

[22] Compare *In the Interest of S. J.*, 270 Ga. App. 598, 609 (1) (c) (607 SE2d 225) (2004) (finding of deprivation reversed where, among other things, juvenile court's finding that mother exhibited a medically verifiable deficiency so as to render her unable to provide for her child was not supported by the evidence; psychologist who diagnosed a mother with depression did not evaluate her for parenting capacity).

care about or to understand the consequences of losing her place of residence again. The mother did not demonstrate the ability to "do a lot of things," such as setting up doctor appointments for the children and being able to keep food in the home. The clinician did not believe the mother was capable of providing and caring properly for her children. Accordingly, any rational trier of fact could have found by clear and convincing evidence that the mother suffered from a medically verifiable deficiency such as to render her unable to provide adequately for the needs of her children, including one child with a communication disorder.[23]

(ii) *Finding that the mother without justifiable cause had failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights to: develop and maintain a parental bond with the children in a meaningful, supportive manner, provide for the care and support of the children as required by law or judicial decree, and comply with a court-ordered case plan designed to reunite the children with the parent.* Where children are not in the parent's custody, OCGA § 15-11-94 (b) (4) (C) provides that the aforementioned are additional factors for the court to consider in determining whether children are deprived because they are "without proper parental care and control."

The mother takes issue with the termination petition being filed less than one year after the filing of the case plans. But "[e]ven if the reunification plan[s] ha[ve] been in effect for less than one year, a termination of parental rights may be warranted by other factors."[24] There was evidence that the mother: failed to exercise visitation with her children, to the extent that one child no longer knew who she was; moved to two other states in a short period of time; failed to provide proof of income and stable housing as required under her case plans; failed to complete counseling sessions and follow psychological treatment recommendations; failed to complete parent-aide sessions; and failed to maintain a stable residence such that DFCS could provide services for her to regain custody of her children. The record supports the juvenile court's conclusion that the lack of proper parental care or control caused A. R.'s and J. R.'s deprivation.[25]

The mother contends that the juvenile court's finding that she failed to pay child support is not supported by the record. "Even

---

[23] See *In the Interest of Z. H. T.*, supra; *In the Interest of J. J. J.*, 289 Ga. App. 466, 467-468 (657 SE2d 588) (2008); *In the Interest of T. B. R.*, 304 Ga. App. 773, 779 (1) (a) (697 SE2d 878) (2010); *In the Interest of K. N.*, 272 Ga. App. 45, 53 (a) (2) (611 SE2d 713) (2005).

[24] *In the Interest of C. A. S.*, 308 Ga. App. 757, 760 (2) (708 SE2d 655) (2011) (citation and punctuation omitted).

[25] See id.

assuming certain findings of the juvenile court are not supported by the record, there remain many authorized findings that support the court's finding of deprivation,"[26] as stated above. In any event, the record shows that prior to the mother's move to Tennessee, she did not have a job and never provided proof of income to the court. There is no evidence in the record that the mother provided any financial support for A. R. and J. R., other than the one time she sent money for J. R.'s birthday.

(c) *Finding that the cause of the deprivation was likely to continue.* In support of her assertion that DFCS failed to prove that the cause of the deprivation was likely to continue, the mother claims, among other things, that by the time of the termination hearing, "it is undisputed that [she] had been continuously employed in the same job on a full time basis for the past four to five months. She had achieved housing stability, having resided for approximately five months in [a] large apartment that she shared with other family members, and she intended to stay there."

> [A]lthough it is well settled that a juvenile court may consider the past conduct of the parent in determining whether the conditions of deprivation are likely to continue, it is equally true that evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required. However, in considering past deprivations compared to present achievements, juvenile courts are entitled to assign much less weight to such assertions of sudden parental fitness when compared to the other evidence. In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation.[27]

As part of the mother's case plan she was required to, for a minimum of six consecutive months, obtain and maintain a source of income/support and to provide the DFCS case manager with monthly verification of income. The mother was also required to, for a minimum of six consecutive months, obtain and maintain stable, clean, and safe housing, and to provide her case manager with monthly verification that rent and utility payments were current. Although

---

[26] See *In the Interest of R. C. H.*, 307 Ga. App. 774, 777 (1) (706 SE2d 686) (2011) (citation and punctuation omitted).

[27] *In the Interest of D. B. C.*, 292 Ga. App. 487, 496 (1) (c) (664 SE2d 848) (2008) (citations and punctuation omitted).

the case manager repeatedly asked the mother for verifiable proof of income, she never received any. And there was no evidence that the mother's rent and utility payments were current.

The clinician who had worked with the mother testified that based on her observations and consultations with the mother, she did not believe that the mother had the capacity to adequately parent her children on her own.[28] According to the parent aide who had worked with the mother on her parenting skills, the mother exerted minimal effort and made little progress; the aide was concerned about the mother's inability to apply the things she was taught.[29]

The evidence presented at the termination hearing further established that the mother: did not take her depression medication; missed appointments with her mental health counselor; missed visitation with her children; moved to two different states within a period of six months and discussed moving to a third state, effectively hindering DFCS's ability to transfer agency services to her at any new place of residence; and showed no proof of income or stable housing as required under the case plan.[30]

Evidence of the mother's past conduct was properly considered in determining whether the cause of the children's deprivation was likely to continue, and testimony given by her brother at the hearing could be viewed as "positive promises which are contrary to negative past fact."[31] In reviewing the question of whether any rational trier of fact could have found by clear and convincing evidence that the mother's rights should have been terminated, "the appellate court must necessarily defer to the juvenile court's fact finding, weighing of the evidence, and credibility determinations."[32] Any rational trier of fact could have found by clear and convincing evidence that the cause of the children's deprivation was likely to continue.[33]

(d) *Finding that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.* The mother does not challenge the juvenile court's finding as to this factor. Notwithstanding, "it is well settled that children need permanence of home and emotional stability or they are likely to suffer serious

---

[28] See *In the Interest of A. R.*, supra at 710 (1) (c).

[29] See id. at 708 (1) (c).

[30] See *In the Interest of Z. H. T.*, supra at 431 (1) (c) ("repeated failure to comply with case plan goals may show that the cause of deprivation is likely to continue").

[31] See *In the Interest of J. J. J.*, supra at 470 (punctuation and footnote omitted).

[32] *In the Interest of A. C.*, 285 Ga. 829, 836 (3) (686 SE2d 635) (2009).

[33] See *In the Interest of D. B. C.*, supra; *In the Interest of S. P.*, 300 Ga. App. 883, 887 (3) (686 SE2d 474) (2009).

emotional problems."[34] Evidence of a parent's repeated failures to take the steps necessary to reunite with her children is sufficient to prove that continued deprivation will cause serious physical, mental, emotional or moral harm.[35] Here, the mother repeatedly failed to comply with the requirements of her case plan to reunite with her children. A. R. and J. R.'s foster mother, with whom the children had lived for the past 15 months, testified that she was interested in adopting the children. The juvenile court's finding that continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to A. R. and J. R. is supported by the record.[36]

2. *Best interest of the children.* As for the second prong of the termination analysis, the mother does not challenge the juvenile court's finding that termination of her parental rights is in the best interest of the children. Notwithstanding, we are persuaded that the evidence shows that termination of the mother's parental rights was in the best interest of the children, considering the children's physical, mental, emotional, and moral condition and their "need for a secure and stable home."[37]

"The same evidence showing parental misconduct or inability may, and here does, establish this requirement."[38] Children need permanency, stability, and a safe environment, which the mother has not demonstrated she can provide.[39] "The juvenile court was authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care."[40]

"Given this evidence, and having reviewed the entire record in this case, we find there is sufficient clear and convincing evidence to support the juvenile court's decision to terminate the mother's parental rights."[41]

*Judgment affirmed. Andrews, J., concurs. McFadden, J., concurs specially and in judgment only.*

---

[34] *In the Interest of A. B.*, 274 Ga. App. 230, 232 (617 SE2d 189) (2005) (citation omitted).

[35] Id.

[36] See id.

[37] OCGA § 15-11-94 (a); id.

[38] *In the Interest of T. J.*, 281 Ga. App. 673, 675-676 (1) (637 SE2d 75) (2006) (citations and punctuation omitted); see *In the Interest of M. L. P.*, 236 Ga. App. 504, 510 (1) (d) (512 SE2d 652) (1999) (juvenile court has broad discretion in determining how the interest of the child is best served).

[39] See *In the Interest of T. J.*, supra at 676 (1).

[40] Id. (citation and punctuation omitted).

[41] Id.

MCFADDEN, Judge, concurring specially and in the judgment only.

I limit my concurrence to the judgment only and write separately in order to emphasize that our decision today is not a departure from the settled rule that "poverty alone is not a basis for termination" of parental rights. (Citation omitted.) *In the Interest of C. T.*, 286 Ga. App. 186, 190 (2) (648 SE2d 708) (2007).

DECIDED MARCH 30, 2012.

*Jones & Erwin, Anthony B. Erwin, Rebecca B. Paris*, for appellant.

*Samuel S. Olens, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Holly A. Bradfield, Calandra A. Harps, Assistant Attorneys General, Elinor H. Portivent*, for appellee.