## A09A0276. LORD v. THE STATE.
### (676 SE2d 404)

ELLINGTON, Judge.

An Oconee County jury found Tony Lord guilty of two counts of aggravated assault[1] (family violence), OCGA § 16-5-21 (a), (j). Lord appeals from the consent order dismissing his motion for new trial,[2] contending the court erred in denying his motion to suppress evidence seized from his home and his car and in failing to merge his convictions. Finding no reversible error, we affirm.

1. Lord contends the trial court erred in denying his motion to suppress evidence seized from his home and his car. Specifically, he contends that the court should have suppressed (a) photographs taken by the police inside his home before the magistrate issued a warrant to search his home; (b) all evidence seized from his home pursuant to a search warrant he contends was invalid; and (c) photographs taken of the interior of his car prior to the issuance of a search warrant for the car. For the following reasons, we find that the trial court did not err in denying Lord's motion to suppress.

> When an appellate court reviews a trial court's order concerning a motion to suppress evidence, the appellate court should be guided by three principles with regard to the interpretation of the trial court's judgment of the facts. First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

(Citations, punctuation and emphasis omitted.) *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994); see also *Walker v. State*, 262 Ga. App. 872, 873 (586 SE2d 757) (2003) (accord). So viewed, the record reveals the following relevant facts.

On August 4, 2006, an Athens-Clarke County police officer was

---

[1] As more fully discussed in Division 2, infra, the jury found Lord guilty of aggravated assault with intent to murder, OCGA § 16-5-21 (a) (1), and aggravated assault with a deadly weapon, OCGA § 16-5-21 (a) (2).

[2] As this order is one finally disposing of Lord's motion for new trial, Lord's timely appeal from that order confers jurisdiction upon this Court. See *Heard v. State*, 274 Ga. 196, 196-198 (1) (552 SE2d 818) (2001).

dispatched to meet James Kellough, who had placed a 911 call at 4:46 a.m. reporting a battery. A frantic and somewhat intoxicated Kellough told the officer that he had witnessed his friend, Tony Lord, brutally beat Carmen Agarenzo, Lord's live-in girlfriend, and that he was afraid Lord would kill her. Kellough told the officer that Lord had asked him to go with him to the Polo Club Apartments to retrieve Agarenzo, who had gotten separated from Lord earlier that morning while they were out drinking. They picked up Agarenzo, who got in the passenger side of the car. As Lord drove away from the apartments, he started punching Agarenzo and bashing her head into the car's dashboard, cursing her and threatening to kill her. Kellough told the officer that Agarenzo, who was bleeding heavily and fading in and out of consciousness, attempted to get out of the car while it was moving. When Lord stopped the car to pull her back inside, Kellough, who was in the back seat, got out. Lord drove away with Agarenzo, and Kellough called the police from his cell phone.

Kellough told the officer that Lord lived in the Windy Hills subdivision in Oconee County and described Lord's car, a white Ford Taurus. The officer relayed this information to the Oconee County Sheriff's Department and asked that they check Lord's residence to see if Agarenzo was safe. Later, the officer spoke with an Oconee County sheriff's deputy. The deputy told the officer that he had responded to a burglar alarm call at Lord's residence, had met Lord, had seen the white Ford Taurus and its bloodied interior, and had witnessed Agarenzo staggering from the woods. Based on this information, the officer asked the deputy to detain Lord on a battery charge until he could get there.

Not too long after the Athens-Clarke County police began investigating Kellough's 911 call, the Oconee County Sheriff's Department sent deputies to Lord's residence in response to a burglar alarm. At about 5:36 a.m., as the Oconee County deputies were arriving at Lord's house, they received additional information from dispatch that Clarke County had requested a "welfare check" on Agarenzo. As the deputies walked up to Lord's house, they could see Lord standing in his doorway and could hear him talking on the cell phone with someone about his burglar alarm. Lord appeared disheveled and had a strange "wild-eyed" demeanor. A deputy asked Lord where Agarenzo was, and Lord said she was in Athens with another man. The deputies asked if they could search the house for Agarenzo, and Lord consented.

As one deputy stood in the kitchen with Lord, another walked through the house toward the bedroom, doing a brief two-minute "sweep" of the house. In the bedroom, the deputy saw a pornographic video playing on the television and a bloody, face-shaped imprint on the upper left-hand corner of a bed sheet. As the deputy

came back down the hallway toward the kitchen, a third deputy stepped inside and informed the others that he could see, in plain view, blood splatter and clumps of long, blond hair inside the white, Ford Taurus parked outside. The deputies stepped outside with Lord and observed the condition of the car without opening it. Around the time the deputy announced seeing blood inside Lord's car, Lord withdrew his consent to search his home.

The deputies, concerned that Agarenzo had been the victim of an attack by Lord, handcuffed Lord and placed him in the back of a patrol car. One of the deputies radioed the Athens-Clarke County officer who had asked for the welfare check and learned that Lord had allegedly beaten his girlfriend in the car while they were in Clarke County and that the officer wanted Lord detained on suspicion of battery. While Lord was inside the patrol car, Agarenzo emerged from the woods near the house. She was bloody, disoriented, and crying. One of her eyes was bulging, as if it had been damaged. She could barely speak. When the deputies asked her if Lord had done this to her, she nodded "yes." The deputies called for an ambulance, and the responding paramedics took Agarenzo to the hospital.

The Athens-Clarke County officer arrived at Lord's residence shortly after Agarenzo had been transported to the hospital. He arrested Lord for battery. He met with the deputies and then photographed Lord's car. The officer went inside the house, at the request of the Oconee County deputies, to look at some bloody clothing that Lord was suspected of wearing earlier that evening. The officer observed blood droplets and splatter inside the house and saw what appeared to him to be a bloody faceprint on Lord's bed sheet. The officer took 14 photographs, identified as State's Exhibits 1-14, most of which were of the car. Although the officer did not touch anything inside the car, he opened the car doors to facilitate taking pictures of the blood splatter in State's Exhibits 7-11 and 13. The officer also took three pictures of Lord's bedroom and one of the bathroom. He did not move or touch anything inside the house as the Oconee County deputies were securing Lord's home as a crime scene.

An Oconee County detective also took photographs of Lord's car and home when he arrived. These photographs, identified as State's Exhibits 19-33, were of the interior and exterior of Lord's car and the interior of Lord's residence. The detective testified that he opened the car door and moved the passenger side visor to facilitate photographing the blood inside the car. Inside the home, the detective did not open any drawers or move anything, but, instead, documented the evidence he saw in plain view. After the car was photographed, it was impounded and towed to the Athens-Clarke County police department.

While the deputies were securing Lord's residence, a domestic violence detective with the Athens-Clarke County police department interviewed Agarenzo at the hospital. The detective observed that Agarenzo had extensive injuries to her face, lips, throat, forehead, arms, and legs. Agarenzo told the detective that Lord beat her in the car, that he punched her, choked her, and threatened to kill her. And when they got home, he continued beating her and choking her. She ran to the bathroom, trying to escape Lord, but he grabbed her, choked her, punched her ear, and banged her head against the toilet and bathroom counter. At some point during the assault, Lord bit Agarenzo's arms and legs. Lord also shoved a curling iron down Agarenzo's throat, which resulted in a severe injury to her hyperpharynx. The Athens-Clarke County detective met with an Oconee County special victims investigator while at the hospital. They shared the information obtained from Agarenzo with each other and with their fellow officers. The Athens-Clarke County detective obtained a search warrant for Lord's car, and the Oconee County investigator obtained a search warrant for Lord's residence.

The affidavit supporting the Oconee County application for a search warrant of Lord's residence was based on the following information: the eyewitness report of a battery against Agarenzo in Clarke County, Lord's disheveled appearance when confronted in Oconee County, his denial that a domestic argument had occurred, the presence of a large quantity of blood in the car, Agarenzo's physical injuries, Agarenzo's statement that she had been assaulted in both Clarke County and Oconee County, Agarenzo's statement that Lord had shoved a curling iron down her throat, and the presence of blood splatter observed inside the house. The Oconee County investigator obtained the signed search warrant at 4:20 p.m. the day of the assault. That afternoon, a Georgia Bureau of Investigation (GBI) crime scene analyst arrived at Lord's residence to execute the search warrant. When he arrived, the officers were outside of Lord's home, not in it, waiting to begin the search. Pursuant to the search warrant, the GBI recovered evidence from Lord's kitchen, living room, master bedroom, and master bathroom, including numerous blood swabs, bloodied clothing and wash towels, a broken necklace, a broken candle holder, a broken belt buckle and a bloodied belt, a blood-stained bed sheet, and the bloodied curling iron.

(a) Lord contends that the trial court should have suppressed State's Exhibits 12-14 and 22-36, photographs taken inside his residence shortly after the crime occurred but prior to the issuance of a search warrant for the home. We disagree.

The deputies entered Lord's home with his consent. Even after that consent was revoked, the police had probable cause to believe

that Lord had committed a battery upon Agarenzo based upon the eyewitness information relayed from the Athens-Clarke County police, Lord's disheveled and "wild-eyed" demeanor, and the blood and hair evidence in plain view in Lord's car.[3] Further, given that Agarenzo was last seen with Lord, that she was likely still in or near the house, and that she was probably in need of immediate medical attention, police protection, or both, the police were authorized to walk through the house looking for Agarenzo under the exigent circumstances exception to the warrant requirement.[4] During the course of this brief sweep of the house, the police saw blood evidence in plain view in the rooms they walked through and, thus, were entitled to seize it. *State v. McTaggart*, 241 Ga. App. 852, 855 (528 SE2d 309) (2000). ("A police officer who observes contraband in plain view is entitled to seize it, so long as he is at a place where he is entitled to be[.]") (citation and punctuation omitted). Shortly after arresting Lord and sending Agarenzo to the hospital, the police, while examining and securing the crime scene, retraced their steps through the house, photographing items of potential evidentiary significance that were in plain view. "Additional investigators or officials may enter a citizen's property after one official has already intruded legally. Later arrivals may join their colleagues even though the exigent circumstances justifying the initial entry no longer exist." (Citation and punctuation omitted.) *State v. Peterson*, 273 Ga. 657, 659 (1) (543 SE2d 692) (2001). In this case, the officers moved nothing, opened no drawers, removed nothing from the premises, and did not exceed the scope of their initial search for Agarenza. Rather, they photographed only those items that were visible during the scope of the initial welfare search. Consequently, the photographs were legally seized and, thus, admissible. See id. at 658-660 (1), (2) (A police officer was authorized to take pictures of and to seize items of evidence observed in plain view within the limited scope of the initial intrusion even though the exigency had expired.). Consequently, we find no error in the court's denial of Lord's motion to suppress the photographs at issue.

(b) Lord contends the trial court should have suppressed the items seized from his house pursuant to the search warrant because

---

[3] "[P]robable cause exists if the arresting officer has knowledge and reasonably trustworthy information about facts and circumstances sufficient for a prudent person to believe the accused has committed an offense." (Citation omitted.) *Patterson v. State*, 274 Ga. 713, 715-716 (2) (559 SE2d 472) (2002).

[4] "An exigent circumstance which does justify the warrantless entry of a private home is the officer's reasonable belief that such action is a necessary response on his part to an emergency situation. It has been repeatedly held that reasonable concern for a victim's welfare justifies a warrantless entry." (Citations and punctuation omitted.) *Lindsey v. State*, 247 Ga. App. 166, 168 (1) (543 SE2d 117) (2000).

the affidavit upon which the warrant was based omitted evidence that would have "indicated the absence of probable cause." Lord contends that the bloody faceprint that the police observed on his bed was actually the victim's menstrual blood, and had they truthfully represented that fact, "no probable cause [would have] existed to issue a search warrant inside the home."

> A magistrate's decision to issue a warrant based upon a finding of probable cause is entitled to substantial deference. The test for probable cause is not hypertechnical. To the contrary, it must be based on the factual and practical considerations of everyday life on which reasonable and prudent men act. Ultimately, this Court's role on review is to determine if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant. If a court determines that an affidavit submitted contains material misrepresentations or omissions, the false statements must be deleted, the omitted truthful material must be included, and the affidavit must be reexamined to determine whether probable cause exists to issue a warrant.

(Citations and punctuation omitted.) *Carter v. State*, 283 Ga. 76, 77 (2) (656 SE2d 524) (2008). Even if the magistrate excluded completely the evidence of the blood-stained sheet, the warrant still contained ample evidence from which to find probable cause that Lord committed a battery upon Agarenzo inside Lord's home, including Agarenzo's physical injuries, her statement that she had been assaulted in both Clarke County and Oconee County, her statement that Lord had shoved a curling iron down her throat, and the presence of *other* blood observed inside the house. Consequently, we find no error.

(c) Lord contends that his car was searched without his consent or a warrant, but does not identify what items of evidence should be suppressed. We assume that Lord is contesting the legality of the photographs taken of his car prior to the issuance of the search warrant because he does not make any legal argument contesting the validity of the search warrant for the car nor does he identify which items of evidence were unlawfully seized pursuant to the warrant. Consequently, we limit our analysis to any search that occurred prior to the issuance of the warrant.

In this case, the police had reports from the victim and an eyewitness that Lord beat Agarenzo in the car, and they saw, in plain view, blood and hair evidence throughout the car's interior.

> [T]he police officer's viewing of the [blood and hair] in appellant's car through the windshield did not constitute a search. There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers. In short, the conduct that enabled the officers to observe the interior of the vehicle[ ] was not a search within the meaning of the Fourth Amendment.

(Citations and punctuation omitted.) *Catchings v. State*, 256 Ga. 241, 247 (10) (a) (347 SE2d 572) (1986). Further,

> to the extent that the opening of the door and photographing of the [blood and hair] constituted a warrantless search and/or seizure, this was justified by the exigencies of the case. Automobiles, because of their mobility, may be searched without a warrant upon facts not justifying a warrantless search of a residence or office. The cases so holding have, however, always insisted that the officers conducting the search have "reasonable or probable cause" to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search. Under the facts here, it cannot be said that the officer photographing the [blood and hair] in the appellant's car did not have reasonable cause to believe that he would find evidence pertaining to the [battery].

(Citations and punctuation omitted.) Id. at 248 (10) (b). Consequently, the court did not err in refusing to suppress the photographs taken of the victim's car. We find no error.

2. Lord contends the trial court should have merged his two convictions for aggravated assault because the crimes were predicated upon the same facts. We disagree because the record supports a finding that the assaults were predicated upon and supported by evidence of two separate crimes occurring independently of each other. "In determining whether merger has occurred, the key question is whether the different offenses are proven with the same facts. If one crime is complete before the other takes place, the two crimes do not merge." (Citation and punctuation omitted.) *Chatfield v. State*, 279 Ga. App. 32, 35 (2) (630 SE2d 178) (2006).

The State indicted Lord for two counts of aggravated assault, one for assaulting Agarenzo "with intent to murder," pursuant to OCGA § 16-5-21 (a) (1), and the other for assaulting Agarenzo "with the hands of [the] accused, an instrument which, when used offen-

sively against a person, is likely to result in serious bodily injury, by choking," pursuant to OCGA § 16-5-21 (a) (2). The State adduced evidence supporting each of these offenses.

The State showed that Agarenzo suffered two unique and severe injuries as a result of Lord's abuse. First, she was choked so violently that her neck and face swelled and the blood vessels on her face and neck ruptured from the force of increased venous pressure. Photographs revealed the "parallel" bruising where Lord's hands compressed her neck. Second, a CT scan revealed that Agarenzo suffered a "penetrating" injury from something being shoved deep into her throat, which resulted in a pharyngal laceration in the hyperpharynx. The injury was very uncommon and extremely serious, as it could have ruptured her carotid artery or caused a severe infection. Moreover, Agarenzo told investigators and medical personnel that Lord had choked her several times, that he had abused her in several locations in the house during the course of the prolonged assault, and that she lost consciousness a few times. The forensic evidence recovered from the house revealed blood splatter and signs of a violent struggle in almost every room of the house. Agarenzo told her doctor and an investigator that Lord had also crammed a curling iron down her throat. The bloody curling iron was found in Lord's master bathroom, suggesting that this assault occurred there. Further, Kellough testified that Lord repeatedly threatened to kill Agarenzo, and given the violence of his assault in the car, Kellough believed he would do it.

From this evidence, the jury was authorized to infer that, at one point during the struggle inside the house, Lord choked Agarenzo with both hands (leaving parallel injuries) and that he did it violently enough to rupture blood vessels on her face and neck and to render her unconscious. His hands, under the circumstances, were deadly weapons as they were used in a manner likely to, and which did, cause serious bodily injury. See *Hughes v. State*, 266 Ga. App. 203, 204 (2) (596 SE2d 697) (2004) (aggravated assault conviction based on strangulation with hands upheld). The jury could also infer that on a separate occasion, Lord grabbed a curling iron and jammed it down Agarenzo's throat hard enough to lacerate it. Given Lord's threats to kill Agarenzo, the extremely violent and prolonged nature of the abuse, the use of a blunt metal instrument, and the especially deadly nature of this injury, the jury could infer an attempt to murder. See *Reece v. State*, 60 Ga. App. 195 (1) (3 SE2d 229) (1939) (Intent to kill may be inferred from the "nature of the instrument used in making the assault, the manner of its use, and the nature of the wounds inflicted, as well as the brutality and duration of the assault.") (citations and punctuation omitted). Because the evidence supports an inference that the two aggravated assaults occurred at

separate times and in different ways, and because the nature of injuries strongly suggests that it would have been impossible to inflict them both simultaneously with one pair of hands, the trial court did not err in concluding that the offenses did not merge. See *Jones v. State*, 285 Ga. App. 114, 115-116 (1) (645 SE2d 602) (2007) (aggravated assault with knife and aggravated assault with gun did not merge); *Taylor v. State*, 202 Ga. App. 671, 672-673 (415 SE2d 483) (1992) (aggravated assault with a knife and aggravated assault with hands and fists did not merge). We find no error.

*Judgment affirmed. Johnson, P. J., and Mikell, J., concur.*

DECIDED MARCH 26, 2009.

*Cook, Noell, Tolley & Bates, Edward D. Tolley*, for appellant.
*Kenneth W. Mauldin, District Attorney, Brian V. Patterson, Assistant District Attorney*, for appellee.