## A11A0355. STAIB v. THE STATE.
(711 SE2d 362)

ELLINGTON, Chief Judge.

A Floyd County jury found Amanda Staib guilty beyond a reasonable doubt of two counts of cruelty to children in the second degree, OCGA § 16-5-70 (c), and two counts of contributing to the deprivation of a minor, OCGA § 16-12-1 (b) (3). She appeals from the denial of her motion for new trial, contending that the trial court erred in denying her motion to suppress evidence and erred in sentencing her. She also contends that the evidence was insufficient to support her convictions and that her convictions should have merged. For the following reasons, we affirm.

1. Staib argues that the trial court erred when it found that police officers were authorized to enter her home without a warrant and, consequently, erred in denying her motion to suppress evidence gathered subsequent to such entry.

> Because the trial court sits as the trier of fact when ruling on a motion to suppress or a motion in limine, its findings based upon conflicting evidence are analogous to a jury verdict and should not be disturbed by a reviewing court if there is any evidence to support them. When we review a trial court's decision on such motions to exclude evidence, we construe the evidence most favorably to uphold the findings and judgment, and we adopt the trial court's findings on disputed facts and credibility unless they are clearly erroneous. When the evidence is uncontroverted and no question of witness credibility is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review. With mixed questions of fact and law, the appellate court accepts the trial court's findings on disputed facts and witness credibility unless clearly erroneous, but independently applies the legal principles to the facts.

(Citations and punctuation omitted.) *State v. Tousley*, 271 Ga. App. 874 (611 SE2d 139) (2005). So viewed, the record shows the following facts.

At approximately 6:15 a.m. on January 11, 2009, a Floyd County police officer received a call instructing her to report to the local hospital to investigate a domestic violence incident. When she arrived at the hospital, she interviewed Staib, who said that she and her husband had gotten into an altercation earlier that morning and that he had hit her several times in the head. The officer told Staib that she was going to get an arrest warrant for her husband and go to the couple's home to arrest him for simple battery. The officer suggested to Staib that she should stay away from her home for her safety until her husband was arrested. Staib told the officer that her two small children, who were twenty months old and four years old, were in the home and that she did not want them to be left alone in the house. Staib asked the officer to call her if her husband was arrested so she could come to the house and get the children. The officer told Staib that she would call her when she went to the house to arrest her husband.

The officer obtained an arrest warrant for Staib's husband and called Staib at approximately 10:45 a.m., shortly before arriving at her home to arrest her husband. At that time, the officer learned that Staib was at a friend's house in Alabama, approximately one hour away from her home. Staib told the officer that she was going to come home and that she would call and ask her grandmother to go to the house and take care of the children until she got there. The officer told Staib that she would wait at the house until either Staib or a family member could pick up the children.

The officer and two other officers arrived at Staib's home and knocked on the front door.[1] Mr. Staib answered the door, and the officers asked him to step outside. Mr. Staib immediately responded that he knew why the officers were at his home. The officers arrested Mr. Staib pursuant to the warrant and placed him in handcuffs. The officers asked about the children, and Mr. Staib told them that the children were still asleep inside the house. The officers told Mr. Staib that his wife or someone else was coming to take care of the children. However, because no one had arrived yet to care for the children, and because the officers did not want to leave the children inside the house unattended until someone arrived, they told Mr. Staib that they should go inside the house while they waited. Mr. Staib said

---

[1] The video-recorder in one of the officers' patrol cars videotaped the officers' encounter with Mr. Staib outside the house, and the State played the videotape during the hearing on Staib's motion to suppress.

"okay," and the officers followed him into the house.

Upon entering the house, the officers immediately observed extremely unsanitary conditions in the house and recognized that such conditions may constitute evidence of a crime.[2] Consequently, as the officers located the children in the bedrooms and moved them to the front room, they took pictures of the children and of the conditions that were in plain view. While they were waiting for Staib to arrive, her husband told them that her grandmother lived nearby, so an officer contacted the grandmother; within minutes, the grandmother arrived at the house and immediately tried to clean up the house while she watched the children. When Staib arrived at the house, the officers arrested her for cruelty to children.[3]

Prior to trial, Staib moved to suppress the photographs and other evidence obtained subsequent to the officers' entry into her home, asserting that the officers' warrantless entry was illegal, thus rendering the evidence inadmissible. The trial court conducted a hearing on Staib's motion to suppress prior to trial. After hearing the above evidence, the court denied Staib's motion to suppress, finding that Staib knew the officers were going to arrest her husband and, as a result, she had asked the officers not to leave her children alone in the house. Although Staib had said she was going to ask her grandmother to take care of the children, she did not tell the officers where the grandmother lived or how to contact her. The court found, therefore, that the officers were justified in entering the house to take care of the children and to make sure nothing harmed them, noting that it was just a safety issue and a matter of common sense, because "nobody in their right mind would leave [a twenty-month-old toddler and a four-year-old child] in a home and stand outside the door while [the toddler] is in a crib and might wake up. It's just ridiculous to even think so."

(a) Pretermitting whether Mr. Staib's response of "okay" when the officers said they should enter the house constituted his consent to their entry, particularly when he was handcuffed and under arrest at the time, the officers' entry was authorized by another exception to the warrant requirement: exigent circumstances.

It is axiomatic that the Fourth Amendment of the Constitution

---

[2] See Division 2, infra. Notably, at trial, one of the officers testified that he could already smell the house's odor while he was walking in the yard, possibly because some of the house's windows were broken.

[3] The State also charged Mr. Staib with several counts of cruelty to children and contributing to the deprivation of a minor. He was tried jointly with Staib and convicted of two counts of each offense; he also pled guilty to family violence battery for his acts toward his wife. He is not a party to this appeal.

of the United States

> usually prohibits police officers from entering a person's home without the homeowner's consent, absent a warrant allowing them to do so. An exception to the warrant requirement exists, however, where the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.

(Citations and punctuation omitted.) *Love v. State*, 290 Ga. App. 486, 487 (659 SE2d 835) (2008). Exigent circumstances may exist when a warrantless entry is necessary for the police

> to preserve public order, to maintain the peace, and to protect lives, persons, property, health and morals. In these cases, police do not enter a residence for the purpose of arresting or seizing evidence against an occupant; rather, they enter in response to what they reasonably perceive as an emergency involving a threat to life or property.

(Citations and punctuation omitted.) Id. at 488.

> Knowledge or the reasonable belief that minor children in a residence are without adult supervision is an exigent circumstance that authorizes police entry to help those believed to be in need of immediate aid. The temporary care of minor children left without adult supervision by police action requires police to care for the children until responsibility for their care and custody is undertaken by a responsible adult. Indeed, for law enforcement officers to leave minor children unattended after removing the person providing the children with adult supervision may violate the children's right to due process.

(Citations omitted.) *State v. Peterson*, 273 Ga. 657, 659-660 (2) (543 SE2d 692) (2001).

Given the evidence presented in this case, the trial court was authorized to find that the children's age, their undisputed inability to care for themselves, and the lack of adult supervision due to their mother's absence and their father's arrest constituted an exigent circumstance which authorized the officers' entry into the residence for the purpose of temporarily supervising the children until a responsible adult arrived to relieve them. *State v. Peterson*, 273 Ga. at 660 (2).

(b) Staib claims, however, that, before the officers arrested her husband, they knew that the children's grandmother lived nearby and was on her way to the house to take care of the children and, thus, they had no reason to enter the house. But this assertion is not supported by the evidence in the record, which shows that the officers specifically denied that they knew Staib's grandmother lived nearby until Mr. Staib told them (after he had been arrested and he and the officers had entered the house).

(c) Moreover, once the officers were legally in the house pursuant to the exigent circumstances, they were authorized to photograph items of potential evidentiary significance that were in plain view, specifically, the family's living conditions. *Lord v. State*, 297 Ga. App. 88, 92 (1) (a) (676 SE2d 404) (2009); see *State v. Peterson*, 273 Ga. at 657-660 (1), (2) (A police officer was authorized to photograph and to seize items of evidence observed in plain view within the limited scope of the initial intrusion, even though the exigency that justified the warrantless entry no longer existed.).

In this case, the officers took photographs of the home's interior as they moved through the house, looking for the children. They photographed the children in the conditions in which they were found before moving them to the front room so they could be supervised. Other than unlocking a door so that they could release the four-year-boy, G. S., from a bedroom, there is no evidence that the officers moved anything else or that they photographed anything in the house that was not in plain view. Under these circumstances, the photographs were legally seized and, thus, admissible at trial. *State v. Peterson*, 273 Ga. at 657-660 (1), (2); *Lord v. State*, 297 Ga. App. at 92 (1) (a).

Consequently, we find no error in the trial court's denial of Staib's motion to suppress.

2. Staib contends that there was insufficient evidence to support her convictions for cruelty to children in the second degree, arguing that the State failed to present evidence of the essential element of cruel and excessive mental pain.[4]

When a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319

---

[4] Under OCGA § 16-5-70 (c), a person commits the offense of cruelty to children in the second degree "when such person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." The indictment in this case charged Staib with causing the children to suffer "cruel and excessive mental pain," but not physical pain.

(III) (B) (99 SC 2781, 61 LE2d 560) (1979). It is the function of the jury, not this Court, to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the evidence. Id. "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Citation and punctuation omitted.) *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001). Viewed in this light, the record reveals the following facts.

According to the officers, immediately upon entering Staib's residence, they saw that the floor was completely covered in garbage, including empty beer cans, empty cases of beer, food containers and food waste, dirty diapers, feces, broken CDs and electronic equipment, and dirty laundry. While walking through the house looking for the children, the officers saw that there was garbage strewn throughout the entire house. In fact, one officer testified that there was not a single place one could stand in the house where one would not be standing in garbage, and another officer testified that, in his opinion, the house was not suitable for a human to live in. The officers testified that the entire house smelled strongly of urine, feces and ammonia, stated that the odor was "pretty horrible," and compared the odor of the house to a "landfill" and "cat litter box."

The officers found the 20-month-old girl, C. S., standing up in a crib in her parent's bedroom at the end of a hallway. C. S. was not wearing a diaper, clothes or shoes and had urinated in her crib; there was also a large spot of feces on the crib's mattress. The officers were unable to find any clean diapers to put on the toddler.

The officers found four-year-old G. S., who was only wearing shorts, locked in his bedroom, standing behind a door that was chained on the outside, far above his reach. While locked, the door only opened about two to four inches; even when the officers moved the chain to unlock the door, though, they were unable to open it more than two feet due to piles of garbage on the floor. Because G. S. was locked in his bedroom, he could not get to the bathroom and, thus, had urinated in his room. The mattress in the room was covered with stains, and the ammonia smell was so strong that, according to one officer, it would be difficult to stand in the room.

After the officers moved the children to the front room, both children started "foraging" through the garbage, repeatedly trying to eat food out of the trash bags on the floor. According to one of the officers, it looked as though the children had not been bathed in a year. After Staib's grandmother arrived at the house, she was able to find a diaper for C. S. and some clothes for the children, but was unable to find any shoes for either child.

Based upon these observations, the officers contacted the Department of Family and Children Services ("DFCS"), and the

officers and a DFCS caseworker determined that it was necessary to take protective custody of the children. The caseworker's testimony describing the conditions of the house and the children was consistent with that of the officers, and she added that she had lived in third world countries almost all of her life but this was the worst house she had ever been in. The caseworker testified that the children were covered in dirt and "smelled like the house . . . not good at all." Because neither child had on shoes or clothes appropriate for the January weather, she wrapped them in blankets before transporting them to the DFCS office. The caseworker noted that, unlike most children who are removed from their home by a caseworker they do not know, C. S. and G. S. did not scream and cry, but, instead, wanted to be picked up, were smiling and seemed happy to go with her. She added that, when she bathed them at the DFCS office, the children were "super excited to be in the bath tub."

In addition to this evidence, the caseworker testified that, when she took the children into custody, four-year-old G. S. was unable to speak other than to say "momma," and communicated through facial expressions, grunts and other noises. She added, though, that both children otherwise appeared to be "healthy." A second caseworker confirmed that both children were unable to speak and were developmentally delayed when they were removed from their home. At the time of Staib's trial, however, the children had been in DFCS custody for nine months, and G. S. was catching up developmentally and was able to speak in short sentences. Further, C. S. was potty-training, could follow directions, and could speak one and two-word phrases, actions which were typical for her age.

On appeal, Staib argues that the evidence was insufficient to show that the children had experienced "cruel and excessive mental pain" as a result of their living conditions, contending that the DFCS caseworker testified that the children appeared to be "healthy" when they were taken into custody and that the State failed to present any evidence of any statements, actions or observations of distress on the part of the children. Staib also argues that there was no evidence that the conditions of the house were unhealthy for the children, pointing out that the officers allowed the children to stay inside the house until they were taken into custody by DFCS. These arguments lack merit.

"What constitutes cruel or excessive physical or mental pain must be resolved by a jury." (Citation omitted.) *Alford v. State*, 243 Ga. App. 212, 214 (3) (534 SE2d 81) (2000).

> "Cruel" and "excessive" are adjectives which inherently require a consideration of degree; the law does not set a bright line but leaves to the trier of fact, taking into account

societal norms generally accepted, whether certain behavior inflicts "cruel" or "excessive" pain (in this instance, mental rather than physical pain). There will be a gray area where some would say it is and some would say it is not, and neither is wrong as a matter of law. There will be other areas on each end of the scale. We must determine only whether the circumstances here, taking into account the evidence in favor of the finding and all reasonable inferences from that evidence, would prohibit the finding made by the jury.

(Citation and punctuation omitted.) *Bunn v. State*, 307 Ga. App. 381, 382-383 (1) (a) (705 SE2d 180) (2010).

Pretermitting whether the children were, in fact, *physically* healthy when taken into custody, there was more than sufficient evidence from which the jury could infer that the children had suffered cruel and excessive *mental* pain as a result of the patently unhealthy, filthy and dangerous conditions in which they were forced to live. As shown above, the State presented overwhelming evidence of the filthy and neglected conditions of the children; their significant developmental delays, including four-year-old G. S.'s inability to speak; C. S.'s confinement to a urine and feces-stained crib without a diaper, and the fact that G. S. was locked in a urine-soiled bedroom without access to a toilet; the children's fervor to eat trash out of the garbage bags on the floor as soon as they were released from their respective enclosures; the oppressive and obnoxiously foul odors to which they were chronically exposed; and their obvious willingness — even happiness — to leave the house with a stranger. In addition, the State presented the testimony of the officers and the DFCS caseworker regarding their reactions when they were exposed even briefly to the offensive odors and the unsanitary conditions of the house.

Further, the fact that the officers did not instantly remove the children from the house, but kept them inside for an hour or so while the officers and the caseworker assessed the situation and made arrangements for them, does not negate the overwhelming evidence of the unhealthy conditions of the house. As noted above, the events at issue here took place in January, and there were no shoes or appropriate clothing in the house for the children to wear outside; in fact, they had to be wrapped in a blanket just to make the trip to the DFCS office.

Accordingly, we find that the evidence presented and all reasonable inferences from that evidence, when viewed in the light most favorable to the jury's verdict, were sufficient to support the jury's conclusion that the children suffered cruel and excessive mental

pain, as alleged in the indictment, beyond a reasonable doubt. See *Bunn v. State*, 307 Ga. App. at 382-383 (1) (a); *Alford v. State*, 243 Ga. App. at 214 (3).[5]

3. Staib contends that the trial court should have applied the rule of lenity and sentenced her for the misdemeanor convictions of contributing to the deprivation of a minor instead of for the felony charges of cruelty to children.

> The rule of lenity entitles the accused to the lesser of two penalties where the *same* conduct would support either a felony or a misdemeanor conviction. Even though the rule of lenity may apply when the applicable misdemeanor is not a lesser included offense to the charged felony, the essential requirement of the rule of lenity is that both crimes could be proved with the same evidence.

(Punctuation and footnote omitted; emphasis in original.) *Johnson v. State*, 283 Ga. App. 99, 107 (5) (640 SE2d 644) (2006). See also *Dixon v. State*, 278 Ga. 4, 7 (1) (d) (596 SE2d 147) (2004) (Under the rule of lenity, "where any uncertainty develops as to which penal clause is applicable, the accused is entitled to have the lesser of two penalties administered.") (punctuation and footnote omitted).

In *Johnson*, this Court specifically considered and rejected the same argument as that propounded by Staib, ruling as follows:

> [The defendant's] cruelty to children conviction required proof that she caused [the victim] excessive mental pain. Contributing to the deprivation of a minor, by contrast, requires a showing that the defendant wilfully committed an act or wilfully failed to act "when such act or omission would cause a minor to be found to be a deprived child," which is statutorily defined as a child who lacks "proper parental care or control or other care or control necessary for the child's physical, mental, or emotional health or morals."[6] [The defendant's] conviction for contributing to the deprivation of

---

[5] Cf. *Hightower v. State*, 256 Ga. App. 793, 794-796 (1) (570 SE2d 22) (2002) (The 25-year-old defendant was charged with cruelty to children in the first degree, child molestation and statutory rape based upon evidence that he had sexual intercourse with a 14-year-old girl. At trial, the victim specifically testified that she did not suffer any mental or physical pain as a result of the intercourse or her relationship with the defendant, which she described as consensual. Thus, the evidence was insufficient to prove that the victim suffered cruel or excessive physical or mental pain or that the defendant maliciously caused such pain, as required by OCGA § 16-5-70 (b). This Court noted that, otherwise, every incident of statutory rape would also constitute cruelty to children in the first degree.).

[6] See OCGA §§ 15-11-2 (8) (definition of a "deprived child"); 16-12-1 (b) (3) ("A person

a minor, therefore, required proof that she failed to provide [her child] with the proper care necessary for [his or] her health. . . . Because different facts were required to prove . . . cruelty to children[ ] and contributing to the deprivation of a minor, the rule of lenity does not apply.

(Punctuation and footnotes omitted.) Id. at 107-108 (5). Accordingly, this claim of error lacks merit.

4. Staib contends that her misdemeanor convictions on Counts 7 and 8, contributing to the deprivation of G. S. and C. S., respectively, should have merged into her corresponding felony convictions for cruelty to children, Counts 5 and 6. We disagree.

Under OCGA § 16-1-7 (a) (1), "[w]hen the same conduct of an accused may establish the commission of more than one crime, the accused may be prosecuted for each crime. He may not, however, be convicted of more than one crime if . . . [o]ne crime is included in the other[.]" In determining whether there are two separate offenses or one crime is included in the other, Georgia's courts apply the "required evidence" test. *Williams v. State*, 293 Ga. App. 193, 195 (1) (666 SE2d 703) (2008).

[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the [required evidence test requires a determination of] whether each provision requires proof of a fact which the other does not. As [the Supreme Court of Georgia] stated previously, a single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

(Citation and punctuation omitted.) Id. See also *Drinkard v. Walker*, 281 Ga. 211, 214-217 (636 SE2d 530) (2006) (adopting the "required evidence" test for determining when one crime is included in another under OCGA § 16-1-6 (1), and overruling cases which are inconsistent with that test).

As shown in footnote 4 and Division 3, supra, the offenses of cruelty to children in the second degree and contributing to the deprivation of a minor each has at least one essential element that

commits the offense of contributing to the . . . deprivation of a minor when such person . . . [w]illfully commits an act or acts or willfully fails to act when such act or omission would cause a minor to be found to be a deprived child[.]").

the other does not: causing the child cruel or excessive physical or mental pain and wilfully failing to provide the child with the proper care necessary for his or her health, respectively. Therefore, pursuant to the "required evidence" test, the offenses do not merge as a matter of law. *Williams v. State*, 293 Ga. App. at 193 (1). Thus, there was no error.

5. Staib contends that the trial court erred in sentencing her to ten years, to serve six years in prison, as compared to her husband's sentence of ten years, to serve four years, when they were both convicted of the same crimes. She argues that the two-year disparity between the sentences shows that the trial court punished her for testifying on her own behalf at trial.[7] We disagree.

(a) "It is well-established that there is a presumption that [a] sentence was correctly imposed, and the burden of showing that a sentence was not correctly imposed is with the party who asserts its impropriety." (Citations and punctuation omitted.) *State v. Freeman*, 198 Ga. App. 553, 557 (3) (402 SE2d 529) (1991).

The record shows that, throughout her trial, Staib's defense was premised upon her claim that she lacked any knowledge of the conditions of the children and of her home on the day she and her husband were arrested, that such conditions must have been created during the few hours that she was away from her home that morning, and, therefore, that her husband was solely responsible for the deplorable conditions.[8]

During sentencing, the trial court described Staib's defense as "totally unfathomable," given the photographs and other evidence presented by the State. The court specifically noted that Staib had consistently refused to show any remorse or take any responsibility for her acts and her neglect of her children, instead choosing to place all the blame on her husband. According to the court, "[w]ithout remorse[,] there is no mercy," and it stated that her refusal to accept any responsibility would be reflected in her sentence. Further, in addressing Staib's concern that she would lose her nursing license as a result

---

[7] Although Mr. Staib did not testify at trial, he presented three witnesses to testify on his behalf.

[8] For example, during opening statements, her counsel told the jury that, the State was "trying to convict Ms. Staib of things that happened while she was gone." According to counsel, when Staib left the house that morning, all of the trash was in garbage bags and the bags were sitting in a corner. Further, Staib's counsel blamed the toddler, C. S., for taking off her diaper and four-year-old G. S. for smearing his feces on the wall, suggesting that the children were responsible for the messes in the crib and the bedroom. Counsel summarized his argument by asserting that the deplorable conditions found by officers "happened while [Staib] was at the hospital seeking treatment" and that she was not responsible for the crimes, but was, instead, a victim. Counsel reasserted these arguments when moving for a directed verdict and during his closing arguments, at which time he told the jury that Staib's husband had deliberately "trashed the place" while she was gone.

of her convictions and sentence, the court stated its belief that, given the facts in this case, her inability to work as a nurse would actually protect the patients at the hospital where she was employed.

Given these statements, which strongly suggest that the trial court found that Staib's defense was based upon lies and asserted in bad faith, we conclude that Staib has failed to meet her burden of showing that the court acted improperly in imposing her sentences. See *State v. Freeman*, 198 Ga. App. at 557 (3) (regarding defendant's burden of proof).

(b) Moreover, even if the trial court had not explained its reasoning for imposing harsher sentences upon Staib, the sentences were within the statutory limits for each of the crimes for which Staib was convicted. See OCGA §§ 16-5-70 (e) (2) (authorizes a sentence for a conviction of cruelty to children in the second degree of between one and ten years imprisonment); 16-12-1 (b) (3) (authorizes a sentence for a conviction of contributing to the deprivation of a minor of up to one year imprisonment and/or a fine of not more than $1,000). "We will not review for legal error any sentence which is within the statutory limits." (Citations and punctuation omitted.) *Brown v. State*, 242 Ga. App. 347, 349-350 (3) (529 SE2d 650) (2000).

Accordingly, Staib has failed to demonstrate that her sentences were unlawful.

*Judgment affirmed. Miller, P. J., and Doyle, J., concur.*

DECIDED JUNE 6, 2011.

*Lee W. Fitzpatrick*, for appellant.
*Leigh E. Patterson, District Attorney, Suhirjahaan S. Morehead, Assistant District Attorney*, for appellee.